Jacob M. Polakoff, Bar No. 035832006
jpolakoff@bm.net
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel. 215.875.3000
Fax 215.875.4604

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **KRISHNENDU CHAKRABORTY, on behalf of himself and all others similarly situated,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**TD BANK, N.A.;**<br><br>**Defendant.** | **Civil Action No. _____**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 2

THE PARTIES .................................................................................................... 10

    A.    Defendant ............................................................................... 10

    B.    Plaintiff .................................................................................. 10

FACTUAL ALLEGATIONS ............................................................................... 11

    A.    Overview of the Payment Card Foreign Exchange Market ............... 11

    B.    Applicable Contractual Provisions ....................................... 15

            1.    TD Bank's Agreements with Class Members. ......................... 16

            2.    TD Bank's Agreements with Visa. ............................................ 18

    C.    TD Bank Charged Unlawful Foreign Exchange Rates in Violation of its Contracts ........................................................................... 20

            1.    TD Bank Imposed Higher Than Contractually Promised Rates Cardholders. ........................................................................... 20

CLASS ACTION ALLEGATIONS ..................................................................... 22

CLAIMS FOR RELIEF ...................................................................................... 25

PRAYER FOR RELIEF ..................................................................................... 33

DEMAND FOR JURY TRIAL ........................................................................... 34

Plaintiff Krishnendu Chakraborty ("Plaintiff"), alleges the following claims for relief against Defendant TD Bank, N.A. ("TD Bank" or "Defendant").

## INTRODUCTION

1.      Defendant TD Bank is a nationally chartered banking association that offers deposit accounts, investment and financial services, mortgage and non-mortgage loans facilities, and credit and debit cards issued to consumer and business clients. TD Bank issues Visa-branded credit and debit cards.

2.      Visa Inc., Visa U.S.A. Inc., and Visa International Service Association (collectively "Visa") are together a U.S.-based multinational financial services corporation that processes electronic funds transfers throughout the world through their electronic payments network (known as "VisaNet"), most commonly through Visa-branded credit cards, debit cards, and prepaid cards (collectively, "payment cards").

3.      Plaintiff and members of the proposed Classes[1] are TD Bank payment card cardholders in the U.S. who were issued TD Bank Visa-branded payment cards, and used those cards to transact in foreign currencies.

4.      Visa does not issue payment cards directly to consumers. Instead, they provide financial institutions—including Defendant TD Bank—with Visa-branded

---

[1] The Nationwide Class and proposed alternative state subclasses are referred to herein as the "Classes."

payment products that the financial institutions then use to offer payment cards to their cardholders.

5.    Visa requires the banks that issue Visa-branded payment cards (the "member banks") to agree to be bound by certain rules of Visa. These rules provide, *inter alia*, that the foreign exchange ("FX") rates applied to consumer payment card transactions in foreign currencies for each day will either be wholesale FX market rates or a government-mandated rate where applicable. The vast majority of jurisdictions do not have government-mandated rates.

6.    The Visa Rules also provide that the member banks must provide specific disclosures to member bank payment card cardholders describing what FX rates will be imposed.

7.    TD Bank requires all of its cardholders, including Plaintiff and members of the proposed Classes, to agree to the terms of standardized credit card agreements ("Cardholder Agreements") and debit card agreements ("Deposit Account Agreements") as a condition of being issued a TD Bank payment card.

8.    The member banks, including TD Bank, include language referencing the Visa rules in their Cardholder Agreements and Deposit Account Agreements, promising their cardholders, including Plaintiff and Class Members, that the FX

rates applied to foreign transactions will be either wholesale market rates or, in jurisdictions that have them, government-mandated rates.[2]

9.     Contrary to the Cardholder Agreements and Deposit Account Agreements between TD Bank and Plaintiff and members of the proposed Classes, the FX rates applied to FX cardholder transactions do not represent rates available in the wholesale FX market.

10.    Further, even when the FX rates imposed by Visa are within the trading ranges of the individual currencies within the wholesale market for the applicable dates, the methods by which the rates are imposed are unfair, in bad faith, and therefore in violation of the Cardholder Agreements and Deposit Account Agreements.

11.    Based on the language of their Credit Card Agreements, cardholders reasonably expect (and are led to believe) that the member banks are charging wholesale rates that bear some resemblance to the rates that the Processors and the banks themselves receive because the Processors and banks are themselves

---

[2]  Some countries use fixed exchange rate systems, sometimes called a pegged exchange rate, in which their respective currency's value is fixed or pegged by a monetary authority against the value of another currency, such as the U.S. Dollar. For example, the Bermudian dollar is pegged to the U.S. Dollar at a one-to-one ratio by the Bermuda Monetary Authority. Visa does not apply government-mandated exchange rates for foreign payment card transactions in the limited set of countries that have adopted fixed exchange rate systems; instead, Visa adjusts the rates to provide a profit for itself. For all other currencies, TD Bank's contracts with its cardholders all provide that wholesale FX market rates must be applied.

transacting in foreign currencies to facilitate the cardholders' transactions. In fact, however, the banks and Processors rarely engage in wholesale market transactions to facilitate the cardholders' transactions. The Processors settle many of the so called "foreign" transactions by U.S. cardholders with foreign merchants in U.S. Dollars, meaning neither the banks nor Processors engage in any currency conversion at all. In these instances, the need for any currency conversion is a pure fiction, and any hidden charge for the same, and/or the manipulation of FX rates in breach of the Credit Card Agreements, is unlawful. While the price the U.S. cardholder was quoted was in a foreign currency at the point of sale, the cardholder's account was in fact debited in U.S. Dollars, and the foreign merchant was paid in currency U.S. Dollars, meaning there was no foreign currency involved in the transaction at all.

12.    Even in transactions that Visa actually settles in foreign currencies, the need for currency exchange is minimal. Visa is engaged in multilateral global transactions on a massive scale (*i.e*., doing multiple transactions in both directions—*e.g*., U.S. Dollars to Euros, and Euros to U.S. Dollars). As a result of all these transactions, Visa is constantly in possession of large amounts of various currencies. Given its own currency balances, Visa only needs to engage in foreign currency transactions to settle any *net* currency settlement requirements.

13.    In sum, the FX rates Visa imposes and that member banks charge cardholders for foreign transactions are largely a fiction and represent a non-

transparent charge. They bear no resemblance to any exchange rate obtained or which could be obtained by the banks or Visa in wholesale markets, as many times Visa exchanged no currency whatsoever (because the transaction was settled in U.S. Dollars or because Visa had foreign currency on hand to settle the transaction with the foreign merchant) or traded at spot or forward FX prices.

14.    Instead of approximating the member banks' and Visa's actual costs of acquiring foreign currency to settle transactions, the rates Visa imposes and banks charge consumers for FX transactions are designed to maximize profits for the banks and Visa. Specifically, the rates imposed vary based on the direction of the transaction, and always favor the banks and Visa. For example, for any given processing date, the rate imposed for converting U.S. Dollars to Euros will be significantly different from the inverse rate for converting Euros to U.S. Dollars. In both instances, it will be outside—or at the very high end of—the daily ranges of wholesale market rates for each currency conversion. This means that the cardholder will always get the worst rate and Visa will always get the best rate.

15.    Wholesale FX market participants make offers to purchase foreign currencies (referred to as a "bid" price), sell FX (the "ask price"), and the difference between the bid and the ask is called the "bid-ask spread." Because the trading volume is so large, bid-ask spreads in the wholesale FX market are generally exceedingly small.

16.     Despite the fact that wholesale market rates are expressed as a bid-ask at a given point in time, the rates imposed by the Processors are not contemporaneous (*i.e.*, from a bid-ask at a given point in time on the wholesale market). Instead, the spread between the two rates imposed by the Processors for each currency pair (e.g., the spread between the rates for Euro to U.S. Dollar and U.S. Dollar to Euro) exceeds the normal bid-ask spread by considerable margins, much greater than those at any given point in time on the markets themselves. In other words, the Processors and banks create a fictional bid-ask spread (the highest rate in the day versus the lowest rate in the day), and then manipulate the rate applied to Class Member transactions so that the members of the proposed Classes either always get the worst possible rate in either direction, or in fact are applied rates that are even outside of this fictional bid-ask spread, making it even worse for these consumers. This practice renders the promise of a rate from the wholesale markets illusory, as the Processors are acting in a way no party to the contract would have reasonably expected—not to impose a bid-ask from the markets at any given point in time, but to impose a bid from one point in time, and an ask from an entirely different point in time—and then applying the worst possible rate for the cardholder in every case in both directions.

17.     This means that the FX rates imposed are excessively costly for cardholders and unreasonably profitable for the banks and processors, including TD Bank and Visa.

18.    The imposition of high exchange rates operates to the banks' benefit because it inflates the overall value of the transaction. This leads to a larger credit card balance which translates to higher interest payments on card balances. For transactions where the cardholder is also obligated to pay a percentage of the transaction as a foreign transaction fee, inflating the total transaction amount also translates into a higher fee for the banks on a percentage basis. Visa makes money on the difference between the rate applied for consumers to engage in the foreign transaction, and the rate (if any) Visa actually pays to acquire the foreign currency used to settle the transaction. When transactions are settled in the consumer's home currency (where no foreign currency is used at all), Visa's hidden manipulation of the FX rates charged to cardholders enables it to profit at the expense of cardholders. Because Visa also receives a percentage of the value of each transaction as a processing fee, it also benefits directly from inflated transaction amounts.

19.    Members of the proposed Classes transacted millions of dollars in foreign currencies with their Visa-branded TD Bank payment cards during the relevant time period. TD Bank's illegal conduct has caused Plaintiff and the Class Members to pay more for foreign transactions than they would have paid if Defendant had complied in good faith with its contractual obligations to charge wholesale FX market rates rather than contrived rates. Class Members paid more because the FX rates were less favorable than those promised in the relevant

contracts (thereby diminishing Class Members' purchasing power) and also because Defendant's conduct inflated the amount involved in each transaction, thereby causing Class Members to pay higher foreign transaction fees, which are usually charged as a percentage of the total transaction amount, and to pay more in credit card interest than they would have had to pay had the transaction value not been improperly inflated.

## JURISDICTION, VENUE, AND INTERSTATE COMMERCE

20.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d), in that this is a class action in which the aggregate amount in controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Classes are citizens of a state different from Defendant.

21.    The Court has personal jurisdiction over Defendant because Defendant's unlawful acts took place, in substantial part, in New Jersey. Defendant has continuously and systematically transacted FX in this District and throughout the United States. Defendant has its principal place of business in New Jersey.

22.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). Defendant transacts business, and has agents in this District. Additionally, a substantial part of the events giving rise to Plaintiff's claims occurred in this District, and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## THE PARTIES

### A.    Defendant

23.    Defendant TD Bank, N.A. is a federally chartered national banking association with its principal place of business in Cherry Hill, New Jersey. TD Bank, N.A. is referred to herein as "TD Bank." TD Bank issues Visa-branded payment cards.

### B.    Plaintiff

24.    Plaintiff Krishnendu Chakraborty is an individual and a resident of Burlington, Massachusetts. During the relevant time period, Mr. Chakraborty engaged in payment card transactions in Indian Rupees ("INR") with his TD Bank issued Visa-branded debit card. In violation of TD Bank's promises in its contract with Mr. Chakraborty, TD Bank charged Mr. Chakraborty rates that were outside the range of bid-ask spreads on wholesale market rates (for some transactions) and at the very high end of wholesale rates (for other transactions) for U.S. Dollar to Indian Rupees ("USD/INR") exchange rates. TD Bank charged these rates not in good faith, but in an effort to maximize TD Bank's profits at Mr. Chakraborty's expense, in violation of TD Bank's obligations and Mr. Chakraborty's reasonable expectations that TD Bank would act in good faith and treat Plaintiff fairly. The FX rates that TD Bank charged Mr. Chakraborty were more costly to Mr. Chakraborty than they would have been if the rates had been imposed reasonably from within the

wholesale market rate range pursuant to the payment card agreement TD Bank imposed on Mr. Chakraborty.

**FACTUAL ALLEGATIONS**

**A.    Overview of the Payment Card Foreign Exchange Market**

25.    When a U.S. consumer makes a payment card transaction in U.S. dollars with a U.S. merchant, the merchant runs the physical card (or card information, for an online or phone order) through its payment card terminal, the card information is submitted to the processor's electronics payment system, and the system sends information about the transaction to the cardholder's issuing bank to make sure the cardholder has enough money or credit available to complete the purchase, and to confirm that the card is valid and not lost, stolen, fake or expired. The transaction is then approved or declined. For approved transactions, the merchant's account is credited in U.S. Dollars (minus an "interchange fee" paid by the merchant to the bank that issued the consumer's card) and the consumer's account is debited for the full amount of the transaction in U.S. Dollars. Visa sets default interchange fees on payment card transactions that merchants are required to pay to the issuing banks.

26.    When a U.S. consumer makes a payment card transaction denominated in a foreign currency with an overseas merchant, the consumer's payment card account is debited for the transaction in U.S. Dollars, and the merchant is credited

for the transaction in either its home currency or some other agreed-upon currency, such as U.S. Dollars (minus the interchange fee). Regardless of the currency in which the transaction is actually settled, the Processor performs a calculation whereby the amount the consumer pays is determined as if the transaction had been settled in a foreign currency. The exchange rate used for this purpose is determined by the Processor.

27.    The exchange rate used by the processor to convert foreign currencies is applied on the "processing date" of each foreign payment card transaction. The processing date for a payment card transaction is the date on which the issuing bank submits the transaction information to the processor and the processor accepts that information.

28.    For many payment card foreign transactions, the issuing bank charges a "foreign exchange fee," calculated as a percentage of the total transaction amount. TD Bank's payment card contracts advertise foreign transaction fees ranging from 0% (*i.e.*, no foreign transaction fee) to 3%.

29.    Payment card contracts between consumers and issuing banks, like TD Bank, provide that conversion rates for foreign transactions will be determined by the processor pursuant to the processor's operating procedures. Visa's operating procedures for currency conversions are set forth in its guidelines. TD Bank's consumer contracts and Visa's guidelines are detailed below.

30.    The largest participants in the wholesale FX market are dealer banks such as JPMorgan, Deutsche Bank, Citigroup, Barclays, UBS, and HSBC. Dealer banks trade foreign currency with each other and with other large financial institutions including Visa. Wholesale FX market rates are streamed to dealer banks in real time on major multi-bank FX trading platforms including Reuters and Bloomberg. Wholesale FX market participants use these platforms to make offers to purchase foreign currencies and analyze historical wholesale FX market prices.

31.    Visa also engages in foreign currency transactions with dealer banks. Visa engages in such transactions to mitigate the risk associated with foreign currency exchange rate fluctuations,[3] and to obtain currencies necessary to cover cardholders' foreign currency payment card transactions.

32.    However, Visa does not engage in parallel foreign currency transactions on the wholesale FX market for individual cardholder transactions, either on a per-transaction basis, or even on a daily basis.

---

[3] *See infra* n.11.

33.    Instead, Visa maintains derivative contracts and reserves of currency and moves funds between reserves as needed.[4]

34.    As one court found, Visa also incurs "minimal currency conversion costs." *Schwartz v. Visa Int'l Corp.*, No. 822404-4, 2003 WL 1870370, at *28 (Cal. Super. Ct. Apr. 7, 2003).

35.    Because Visa generally settles foreign transactions in both directions for a given currency pair (*e.g.*, Visa has U.S. cardholders making purchases both in Europe and European cardholders making purchases in the U.S.), Visa is only required to "settle" the net amount of each given currency for each day. In other words, if Visa processed $1 billion in transactions from Euros to U.S. Dollars and the same amount from U.S. Dollars to Euros on a particular day, Visa would not need to engage in any actual FX transactions in the wholesale market on that day.

---

[4]  "The Company uses foreign exchange forward derivative contracts to reduce its exposure to foreign currency rate changes on forecasted non-functional [i.e. non-U.S. dollar] currency denominated operational cash flows." *See* Visa Inc., 2017 Form 10-K, *available at* http://d18rn0p25nwr6d.cloudfront.net/CIK-0001403161/cd6545c2-6c6e-4ba1-8dcd-52cd1521df3a.pdf, at 66 (last accessed June 30, 2021); *see also id*. at 50 ("Risks from foreign currency exchange rate fluctuations are primarily related to adverse changes in the functional currency value of revenues generated from foreign currency-denominated transactions and adverse changes in the functional currency value of payments in foreign currencies. We manage these risks by entering into foreign currency forward contracts that hedge exposures of the variability in the functional currency equivalent of anticipated non-functional currency denominated cash flows. Our foreign currency exchange rate risk management program reduces, but does not entirely eliminate, the impact of foreign currency exchange rate movements.").

36.    Moreover, in many instances where U.S. consumers are quoted a price in a foreign currency (i.e., Euros), Visa settles the transactions with the foreign merchant using U.S. Dollars. In these instances, no foreign currency whatsoever is required. The U.S. consumer's account is debited in U.S. Dollars, and the merchant is paid in U.S. Dollars. Visa has no foreign exchange risk for these transactions. The idea that the consumer purchases in a foreign currency in such a transaction is a pure fiction.

37.    For all these reasons, the rates that Visa and TD Bank charge cardholders are not representative of the rates Visa actually pays for foreign currency. Nor are they reflective of any other costs associated with currency conversion that Visa bears. Instead, Visa and TD Bank are engaged in arbitrage: they set rates to maximize profits—and do so without regard to the terms of the contracts that they imposed on cardholders.

## B.    Applicable Contractual Provisions

38.    The contractual obligations between TD Bank and TD Bank's credit card cardholders—including Plaintiff and members of the proposed Classes—are set forth in TD Bank's "Cardholder Agreement." The Cardholder Agreement is provided to credit card applicants who must accept the terms prior to the issuance of each credit card.

39.    The contractual obligations between TD Bank and TD Bank's debit card cardholders – including members of the proposed Classes – are set forth in TD Bank's "Deposit Account Agreement." The Deposit Account Agreement is provided to deposit account applicants who must accept the terms prior to the issuance of each debit card.

40.    Visa's relationships with the issuing banks, including TD Bank, are also governed by written agreements. These terms are memorialized in the Visa Core Rules and VISA Product and Service Rules ("the Visa Rules").[5] Banks that issue Visa credit payment to their cardholders (including TD Bank) are referred to in the Visa Rules as the "Issuers."

### 1.    TD Bank's Agreements with Class Members.

41.    TD Bank is a member of Visa's network.

42.    TD Bank maintains a uniform Cardholder Agreement for each TD Bank-issued credit card product and a uniform Deposit Account Agreement for its debit card products. The terms and conditions set forth in all Cardholder Agreements and Deposit Account Agreements—including the provisions regarding foreign currency exchange rates—are substantially similar. For example, the Cardholder

---

[5] Visa Core Rules and Visa Product and Service Rules, Oct. 17, 2020, *available at*, https://usa.visa.com/dam/VCOM/download/about-visa/visa-rules-public.pdf    (the "Visa Rules").

Agreement for the TD Bank TD Cash Visa Card is substantially the same as the Cardholder Agreement for the TD Bank First Class Visa Signature Credit Card.

43.    At all times relevant to this Complaint, all of TD Bank's Cardholder Agreements and Deposit Account Agreements contained substantially similar foreign currency language. Specifically, for all payment cards issued by TD Bank during the relevant time period, TD Bank's Cardholder Agreements and Deposit Account Agreements required the FX rates imposed on TD Bank's cardholders to be either (1) a wholesale FX market rate, or (2) a government-mandated rate in effect for the processing date.

44.    The language used across all these contracts was identical in relevant part. For example, TD Bank's Visa Cardholder Agreements provide:

> If you use your Account to make a purchase or cash advance in a foreign currency, the transaction will be converted to U.S. Dollars based on a rate selected by VISA U.S.A. Inc. (or any of its affiliates) from the range of rates available in wholesale currency markets for the applicable central processing date (which may vary from the rate VISA U.S.A. Inc. itself receives) or the government-mandated rate in effect for the applicable central processing date. The currency conversion rate used by VISA U.S.A. Inc. (or any of its affiliates) on the currency conversion date may differ from the exchange rate in effect on the day you made the transaction or on the day the transaction is posted to your Account.[6]

---

[6]    Archived    TD    Bank    Cardholder    Agreements    are    available    at https://www.consumerfinance.gov/credit-cards/agreements/.

45.    TD Bank's Deposit Account Agreement similarly provides:[7]

The exchange rate between the transaction currency and the billing currency used for processing international ATM Card or Visa Debit Card transactions is a rate selected by Visa from the range of rates available in wholesale currency markets for the applicable central processing date, which may vary from the rate Visa itself receives, or the government-mandated rate in effect for the applicable central processing date.

## 2.    TD Bank's Agreements with Visa

46.    Visa requires issuing banks, such as TD Bank, to make specific disclosures to consumers about how FX rates will be determined.

47.    Section 1.4.3.2 of the Visa Rules, as updated on October 17, 2020 and as in effect during the relevant period, provides:

An Issuer must provide a complete written disclosure of any fees that may be charged to a Cardholder for an International Transaction or when Currency Conversion occurs and must include the exchange rate between the Transaction Currency and the Billing Currency as either of the following:

A rate selected by Visa from the range of rates available in wholesale currency markets for the applicable Processing Date, which rate may vary from the rate Visa receives; [or]
The rate mandated by a government or governing body in effect for the applicable Processing Date

When Currency Conversion occurs, the Visa rate may be adjusted by the application of an Optional Issuer Fee as determined by the Issuer or via any Issuer self-determined markup outside of VisaNet.

---

[7]    TD Bank, *Deposit Account Agreement*, *available at* https://www.feeds.td.com/en/document/oao/pdf/PersonalAcctAgree.pdf (last accessed June 30, 2021) (emphasis in original).

An Issuer may choose the method by which it notifies the Cardholder. This may include one or more of the following, which may include electronic forms of communication:

  Original Cardholder application agreement
  Terms and conditions
  Billing statement
  Any other agreement between the Cardholder and the Issuer.

48.    Visa mitigates foreign exchange risk by purchasing futures, and does not engage in daily trading to ensure its currency needs are satisfied.[8]

49.    Notably, while TD Bank's consumer agreements indicate that the rates imposed will be either wholesale market rates or government-established rates, TD Bank's agreements do not disclose any of the following:

- That the rates will be "selected" by Visa for Visa's and the bank's sole benefit;

- That, in many instances, the rate is fictitious in the sense of not being derived from an actual transaction and often being outside the range of prices in the wholesale markets because the transactions are being settled in the consumer's home currency, and that the rate "selected"

---

[8] *See* Visa Inc., 2017 Form 10-K, *available at* http://d18rn0p25nwr6d.cloudfront.net/CIK-0001403161/cd6545c2-6c6e-4ba1-8dcd-52cd1521df3a.pdf, at 66 (last accessed June 30, 2021) (noting that Visa uses "currency forward contracts entered into to mitigate a portion of our foreign currency exchange rate risk").

by Visa will be different than the rate used to actually settle the transaction;

- That rates will vary depending on the direction of the currency exchange, and will not be selected from bid-ask rates available contemporaneously on the wholesale market, but will instead be selected for the sole purpose of maximizing the banks' and Visa's profits at the expense of cardholders; and

**C.    TD Bank Charged Unlawful Foreign Exchange Rates in Violation of its Contracts**

50.    Defendant's exchange rate practices with respect to Visa-branded cards violate TD Bank's Cardholder Agreements and Deposit Account Agreements.

**1.    TD Bank Imposed Higher Than Contractually Promised Rates on Cardholders.**

51.    Contrary to the requirements set forth in the TD Bank Cardholder Agreements for credit cards, Deposit Account Agreements for debit cards, and the Visa Rules, the exchange rates Visa imposed on cardholder payment card foreign transactions, and which Defendant charged Class Members on those transactions, are not determined "wholesale market" rates. Instead, Visa imposes, and TD Bank charges, rates that are—for most currencies and on most dates—entirely outside of the range of wholesale market rates in a direction that is disadvantageous for the cardholders and advantageous for Visa and the issuing banks, including TD Bank.

52.    A detailed analysis of Visa's historical exchange rates during the relevant period demonstrates that on a majority of days and for a majority of currencies, Visa imposed and TD Bank charged exchange rates that fell outside of the daily range of wholesale currency market rates on the applicable processing date.[9]

53.    For example, an analysis of the exchange rates applied by Visa to convert cardholder transactions from Euros to U.S. Dollars demonstrates that the rate imposed on consumers was higher than the range of rates available in the wholesale FX market for the applicable processing date on 94 percent of the dates for the period of September 2018 to August 2019. Visa's rates were within the range of rates available in the wholesale FX market on just 6 percent of those dates.

54.    Discovery will show that Visa's method for determining its rates is largely algorithmic, and that Visa's pattern of generating profits for itself by applying rates that are higher than those promised in its cardholder contracts persisted throughout the relevant period, across currency pairs. Each such instance of TD Bank charging rates outside the rates it promised its cardholders in its contracts injured Plaintiff and Class Members and imposed an "overcharge."

---

[9]    *See* Visa Currency Exchange Calculator, *available at* https://usa.visa.com/support/consumer/travel-support/exchange-rate-calculator.html (*last accessed* June 30, 2021).

55.    The extent of the overcharge for each Plaintiff and Class Member payment card transaction can be calculated using transactional data in the possession, custody, or control of TD Bank and Visa; historical Visa rates from Visa's website; and historical wholesale FX market data from third-party providers. Any transactions that were not subject to an overcharge—including transactions that took place on the limited number of dates for which Visa applied an exchange rate that was within the range of rates available in wholesale FX market—can be easily identified from those data sets and excluded.

## CLASS ACTION ALLEGATIONS

56.    Plaintiff asserts his claims on behalf of the following Nationwide Class:

**Nationwide Class:** All persons or entities with a Visa payment card issued by Defendant TD Bank who made a transaction in a foreign currency using such card within the applicable statute of limitations wherein the exchange rate imposed was not a government-mandated rate. Excluded from the Class are Defendant's executives, executives of Visa, and any Judge and judicial staff assigned to this case.

57.    This action is brought, and may properly be maintained, as a class action under Fed. R. Civ. P. 23.

58.    Plaintiff also alleges the following alternative statewide subclass (the "Massachusetts Class") in the event that the Court determines that any of the claims alleged on behalf of the proposed Nationwide Class are unsuitable for nationwide class treatment.

59.    Plaintiff also asserts his claims on behalf of the following Massachusetts Class:

> **Massachusetts Class:** All persons or entities with a Visa payment card residing in Massachusetts issued by Defendant TD Bank who made a transaction in a foreign currency using such card within the applicable statute of limitations wherein the exchange rate imposed was not a government-mandated rate. Excluded from the Class are Defendant's executives, executives of Visa, and any Judge and judicial staff assigned to this case.

60.    <u>Numerosity</u>: The Classes are so numerous that joinder of all Class Members is impracticable.

61.    <u>Typicality</u>:  Plaintiff's claims are typical of the Class Members' claims. Defendant treated Plaintiff in the same manner as other Class Members and did not vary its FX practices from consumer to consumer.

62.    <u>Adequacy</u>:  Plaintiff will fairly and adequately protect the interests of the Classes, has no known conflicts with other Class Members, and has retained counsel experienced in complex class action litigation.

63.    <u>Commonality</u>: Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes.  These common questions include:

a.  Whether Defendant breached its contracts with cardholders by charging exchange rates not authorized by the contracts;

b.  Whether Defendant violated the covenant of good faith and fair dealing in imposing exchange rates;

c.  Whether Defendant was unjustly enriched by its conduct;

d.  Whether Defendant's practices were deceptive, unconscionable, or unfair; and

e.  The proper measure of damages.

64.  Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) because Defendant has acted or refused to act on grounds that apply generally to the Classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Classes as a whole.

65.  Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendant's conduct described in this Complaint stems from common and uniform policies and practices. Members of the Classes do not have an interest in pursuing separate actions against Defendant, as the amount of each Class Member's individual claim is small compared to the expense and burden of individual prosecution. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's

practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class Members' claims in a single forum.

66.    The running of any statute of limitations has been equitably tolled by reason of Defendant's fraudulent concealment and/or omissions of critical information regarding the exchanged rates imposed. Through its affirmative misrepresentations and omissions, Defendant actively concealed from Plaintiff and Class Members that the exchange rates imposed were not a wholesale market rate and/or a rate reasonably related to Defendant's and Visa's actual risk of exchanging foreign currencies. Discovery of Defendant's illegal conduct takes extensive data analysis of foreign exchange data, some of which is not available without paying significant costs.

67.    As a result of Defendant's actions, Plaintiff and Class Members were unaware, and could not have reasonably known or learned through reasonable diligence, that they had been overcharged as a direct and proximate result of Defendant's and Visa's acts and omissions.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Breach of Contract**
**(On Behalf of Plaintiff and Proposed Nationwide Class)**

68.    Plaintiff incorporates each allegation above as if fully set forth herein.

69.    Plaintiff and members of the Nationwide Class entered into contracts with TD Bank that required that the currency conversion rates applied to cardholder foreign currency transactions would be either wholesale FX market rates or a government-mandated rate.

70.    As alleged above, for a substantial percentage of all cardholder transactions during the relevant period, the currency conversion rates applied by TD Bank to cardholder foreign currency transactions were not in fact either wholesale FX market rates or a government-mandated rate. Instead, the rates imposed were higher than those available in wholesale markets on the relevant dates.

71.    In imposing such rates, TD Bank breached the Cardholder Agreements and Deposit Account Agreements with Plaintiff and members of the Nationwide Class.

72.    As a result of TD Bank's breaches of the Cardholder Agreements and Deposit Account Agreements, Plaintiff and members of the Nationwide Class were damaged in the form of overcharges on foreign currency payment card transactions that they otherwise would not have incurred in the absence of TD Bank's unlawful conduct.

### SECOND CLAIM FOR RELIEF
**Contractual Breach of the Implied Covenant of Good Faith and Fair Dealing
(On Behalf of Plaintiff and Proposed Nationwide Class)**

73.    Plaintiff incorporates each allegation above as if fully set forth herein.

74.     TD Bank's Cardholder Agreements and Deposit Account Agreements created the objectively justified expectation that the rates applied for foreign currency exchange would bear some resemblance to rates actually paid by TD Bank and/or Visa on the applicable date.

75.     TD Bank's Cardholder Agreements and Deposit Account Agreements created the objectively justified expectation in cardholders that the spread between the rates imposed on foreign currency exchanges in different directions on the same day would bear a reasonable relationship to the bid/ask spread experienced by participants in the FX wholesale market. Consumers reasonably expected that rates would not be imposed for the sole purpose of maximizing TD Bank's and Visa's profits, without regard to what normal wholesale market conditions would produce.

76.     In light of its position with respect to consumers and the representations in its Agreements, TD Bank had an obligation to ensure that the rates paid by its cardholders were imposed in good faith, and that the rates were not imposed for the sole purpose of maximizing Defendant's and Visa's profits. This is particularly so where, in many instances, TD Bank and Visa were benefitting from the rates without assuming *any* corresponding risk whatsoever because the transactions were being settled in U.S. Dollars, with currency obtained through other contemporaneous transactions, and/or with currency that had been purchased on the FX futures market.

77.    As alleged above, for a substantial percentage of all cardholder transactions during the relevant period, TD Bank applied currency conversion rates to cardholder foreign currency transactions in bad faith at the extreme ends of fictional daily bid-ask ranges of wholesale FX market rates such that Plaintiff and members of the Nationwide Class were injured in the form of overcharges on FX payment card transactions.

78.    TD Bank's practices described herein breached its duties of good faith and fair dealing in the performance and execution of its Agreements with Plaintiff and members of the Nationwide Class.

79.    As a result of TD Bank's breaches of its duties of good faith and fair dealing, Plaintiff and members of the Nationwide Class were damaged in the form of overcharges on foreign currency payment card transactions that they otherwise would not have incurred in the absence of TD Bank's unlawful conduct.

### THIRD CLAIM FOR RELIEF
### Violations of the Delaware Consumer Fraud Act
### (On Behalf of Plaintiff and Proposed Nationwide Class)

80.    Plaintiff incorporates each allegation above as if fully set forth herein.

81.    TD Bank's Cardholder Agreements with credit card cardholders provide that: "Applicable federal law and the substantive laws of the State of Delaware (to the extent not preempted by federal law) without regard to principles of conflicts of law or choice of law shall govern this Agreement."

82.    Defendant's conduct alleged herein constitutes "fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise" in violation of 6 Del. C. § 2513. "'Merchandise' means any objects, wares, goods, commodities, intangibles, real estate or services." 6 Del. C. § 2511.

83.    Defendant's conduct here was deceptive and Defendant made false promises and concealed or omitted material facts. Defendant and Visa imposed FX exchange rates for the sole purpose of maximizing Defendant's and Visa's profits rather than being authorized by the Cardholder Agreements or bearing any reasonable relationship to the corresponding risk of fluctuation in the foreign exchanges markets. The contractual language dictated by Visa and used by Defendant did not disclose that Defendant and Visa would impose rates beyond those allowed by the Agreements.

84.    Defendant's Cardholder Agreements, and the debtor/creditor nature of the relationship also created the objectively justified expectation that the spread between the rates imposed on foreign currency exchanges in different directions on the same day would bear a reasonable relationship to the bid/ask spread experienced by participants in the FX wholesale market. Consumers reasonably expected that rates would not be imposed for the sole purpose of maximizing TD Bank's and

Visa's profits, without regard to what normal wholesale market conditions would produce.

85.    Further, Defendant and Visa benefitted from imposing such FX rates without assuming any corresponding risk because the transactions were being settled in U.S. Dollars, with currency obtained through other contemporaneous transactions, and/or with currency that had been purchased on the FX futures market. As alleged above, for a substantial percentage of all cardholder transactions during the relevant period, the currency conversion rates applied by TD Bank to cardholder foreign currency transactions were imposed at the extreme ends of the daily ranges wholesale FX market rates such that Plaintiff and members of the Nationwide Class were injured in the form of overcharges on FX payment card transactions.

86.    Defendant's practices of applying overcharges to TD Bank credit cardholder foreign currency transactions was continuous throughout at least the relevant period.

87.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and members of the Nationwide Class have been injured in their business and property in that they incurred overcharges on foreign currency payment card transactions that they otherwise would not have incurred in the absence of Defendant's unlawful conduct.

88.    As a result of Defendant's violations of the Delaware Consumer Fraud Act, the Nationwide Class seeks all available damages, pursuant to 6 Del. C. § 2525.

## FOURTH CLAIM FOR RELIEF
### Violations of the Massachusetts Consumer Protection Act
### Mass. Gen. Laws ch. 93A, §1 et seq.
### (On Behalf of Plaintiff and Proposed Massachusetts Class)

89.    Plaintiff incorporates each allegation above as if fully set forth herein.

90.    Defendant's conduct alleged herein constitutes "unfair or deceptive acts or practices" in violation of Mass. Gen. Laws Ann. ch. 93A, § 2.

91.    Defendant has been engaged in trade or commerce as defined by Chapter 93A throughout the relevant period.

92.    Defendant's conduct here was unfair and deceptive and Defendant made false promises and concealed or omitted material facts. Defendant and Visa imposed FX exchange rates for the sole purpose of maximizing Defendant's and Visa's profits rather than being authorized by the Cardholder Agreements or bearing any reasonable relationship to the corresponding risk of fluctuation in the foreign exchanges markets. The contractual language dictated by Visa and used by Defendant did not disclose that Defendant and Visa would impose rates beyond those allowed by the Agreements.

93.    Defendant's Cardholder Agreements and Deposit Account Agreements, and the debtor/creditor nature of the relationship also created the objectively justified expectation that the spread between the rates imposed on

foreign currency exchanges in different directions on the same day would bear a reasonable relationship to the bid/ask spread experienced by participants in the FX wholesale market. Consumers reasonably expected that rates would not be imposed for the sole purpose of maximizing TD Bank's and Visa's profits, without regard to what normal wholesale market conditions would produce.

94.    Further, Defendant and Visa benefitted from imposing such FX rates without assuming any corresponding risk because the transactions were being settled in U.S. Dollars, with currency obtained through other contemporaneous transactions, and/or with currency that had been purchased on the FX futures market. As alleged above, for a substantial percentage of all cardholder transactions during the relevant period, the currency conversion rates applied by TD Bank to cardholder foreign currency transactions were imposed at the extreme ends of the daily ranges wholesale FX market rates such that Plaintiff and members of the Massachusetts Class were injured in the form of overcharges on FX payment card transactions.

95.    Defendant's practices of applying overcharges to cardholder foreign currency transactions were continuous throughout at least the relevant period.

96.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and members of the Massachusetts Class have been injured in their business and property in that they incurred overcharges on foreign currency payment card

transactions that they otherwise would not have incurred in the absence of Defendant's unlawful conduct.

97.    As a result of Defendant's violations of the Massachusetts Consumer Protection Act, Plaintiff and the Massachusetts Class seek all available damages, including treble damages, punitive damages, and attorneys' fees and costs.

98.    Defendant has been mailed or delivered a demand letter in accordance with Chapter 93A. More than thirty days has passed since such demand letter was mailed or delivered, and Defendant has failed to make a reasonable settlement offer in response.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the proposed Classes, asks for judgment against Defendant as follows:

    a.  Certification of this action as a class action on behalf of the proposed Classes;

    b.  Designation of Plaintiff as Class Representative;

    c.  Appointment of undersigned counsel as Class counsel;

    d.  Judgment in favor of Plaintiff on all causes of action;

    e.  Declaration that the practices complained of herein are unlawful;

    f.  Injunction requiring Defendant to cease and desist from engaging in the unlawful practices alleged herein;

g.  Damages in the form of all money improperly collected or received by Defendant;

h.  Disgorgement of all amounts improperly collected or received by Defendant;

i.  An award of pre-judgment and post-judgment interest as provided by law;

j.  An award of attorneys' fees and costs; and

k.  Any further remedy the Court may deem just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff hereby demands a trial by jury on all claims so triable.

Date: July 9, 2021                    /s/Jacob M. Polakoff

Eric L. Cramer*
Jacob M. Polakoff, Bar No. 035832006
Berger Montague PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
T. 215.875.300
F. 215.875.4604
ecramer@bm.net
jpolakoff@bm.net

E. Michelle Drake*
Berger Montague PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
T. 612.594.5933
F. 612.584.4470
emdrake@bm.net
*pro hac vice forthcoming

*Counsel for Plaintiff*

## <u>Civ. Rule 11.2 CERTIFICATION</u>

The undersigned certifies, under penalty of perjury, pursuant to Civ. Rule 11.2, that the matter in controversy in the foregoing Class Action Complaint is not the subject of any other action pending in any court, arbitration forum, or administrative proceeding.

Date: July 9, 2021                    /s/Jacob M. Polakoff

Jacob M. Polakoff, Bar No. 035832006
jpolakoff@bm.net
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel. 215.875.3000
Fax 215.875.4604

*Counsel for Plaintiff*